You'll hear argument first this morning in Case 13-1421, Bank of America v. Caulkett, and the consolidated case. Ms. Spinelli? Mr. Chief Justice, and may it please the Court, Respondent's position is that Section 506 D of the Bankruptcy Code allows Chapter 7 debtors to keep their houses, strip their mortgages, and keep their mortgages under water, and that Section 506 D of the Bankruptcy Code allows debtors to keep their houses, strip their mortgages, and keep their mortgages under water. Do SNP held that Section 506 D voids only liens securing disallowed claims. It does not void liens based on the current value of the collateral. That logic applies whether the current value of the collateral is a million dollars, one dollar, or zero, as virtually every court to address the question has held, and even the Eleventh Circuit below, all but admitted. Outside bankruptcy, the bank would be entitled to have its lien stay with the property until foreclosure or payment in full. Ginsburg, what is the value of a completely underwater second mortgage? How likely is it that it will ever, that the property will ever appreciate to the extent that it will have real value? Justice Ginsburg, it's quite likely. In these two particular cases, to be sure, the second liens are deeply underwater. That's not true in every case, and there's no reason to think it's true in the typical case. We have, Bank of America has many cases pending right now in the Eleventh Circuit. We have cases in which the value of the house would need to rise only by $4,000, where it would need to rise only by $5,000. And given that we're in the middle of a market upswing, it's very plausible and very likely that many of these mortgages will regain equity. We quote statistics in our opening brief that show that between 2012 and 2014, the number of underwater junior mortgages was cut in half, from 4.2 million to 2.1 million. So houses are coming above water every day. And what Doosnip held is that the lien holder, according to the basic non-bankruptcy bargain, is entitled to keep its lien until payment in full or until a lender decides to foreclose. Kennedy, the holders of a second, assuming the second is partially or fully underwater, ever participate in negotiations with the property owner and with the holder of the first lien and say, well, if you keep the property, we'll reduce our junior lien by 50 percent? Is there a negotiation dynamic that the rule that you propose would further? Let me be clear about this, Justice Kennedy, because I think this is important. In Chapter 7 bankruptcies, there are no such negotiations. Chapter 7 is very simple. The debtor turns over his assets to the extent there are any non-exempt, non-encumbered assets, which there typically are not. The trustee will sell those assets, distribute the proceeds to creditors. The debtor then receives a discharge of all pre-petition debt. Well, let's just talk about Chapter 7, because that's what I had in mind. Suppose it's a close case and they're thinking of maybe insisting on sale. Can the junior lien holder say, well, I'm not going to prevail in the sale, but if you don't sell, then I'll cut my lien in half on the chance that it may go up? So you couldn't ever have this negotiated in Chapter 7? In a Chapter 7 bankruptcy, those negotiations simply don't occur. If there's non-exempt equity in the house, the trustee has to sell the house and distribute the proceeds. Scalia. The trustee doesn't care, right? I mean, his job is done once the bankruptcy is over. If it goes up, it's the homeowner who would care. That's correct. And he's not part of the negotiation. He's out of it.   Sotomayor, if the trustee sells it, how does the mortgage holder, in that situation, foreclose? Meaning if the debtor no longer owns the property, this doesn't go free and clean to the purchaser? The way it works, Justice Sotomayor, is that if there is non-exempt equity in the house, which of course was not true in these two cases, the trustee will sell the property, and with those proceeds, the trustee will first satisfy the claim of the senior secured lender. If there's anything left over, it will go to the junior secured lender. If there's not, the junior lender receives nothing and the junior lien is extinct. So when does the facts of this case matter? Because this is before the finish, the wrapping up of the plan, right? In Chapter 7, there is no plan. I'm sorry, this is before the bankruptcy is terminated. I think it's important to understand that Chapter 7 bankruptcies happen very quickly. A no-asset bankruptcy, like this one, will usually be wrapped up in 30 to 45 days. Whereas here, there's no equity in the property to be distributed to creditors and there are no other non-exempt assets, there's really not very much for the trustee to do. The trustee will file a notice that the case is administered, and at that point, a house that's in the situation of these two houses, in which there is no non-exempt, non-encumbered value, will be abandoned to the debtor. At that point, the debtor's rights in the property are precisely what they were before bankruptcy. If the debtor is in default on his mortgage, then the lenders can foreclose. If the- Let me follow up to something, Justice Kennedy. Many of your adversary, plus many others, amici, have argued that if we rule in the way you see, that unholy underwater junior liens are going to be a hold-up, and you're going to use it as hostage value. And they point to various situations in which that has occurred. That, to me, is a concerning policy issue, so explain why that's not true. Justice Sotomayor, my answer to that would be, that's not a bankruptcy problem. There are not negotiations that take place in Chapter 7 as to which the junior lien holder could exercise any hold-up value. It certainly may be the case that later on, the debtor may want to negotiate a modification with its senior lender. That happens all the time to people who have been through Chapter 7 bankruptcy and people who have not. And to the extent there's a housing policy issue, I don't think that's properly addressed through interpretation of the Bankruptcy Code. One of the amici- Well, the Bankruptcy Code wants to give debtors a fresh start. That is true. And to the extent that Chapter 7 is an attempt to do that, if you're able to hold up that fresh start, that is the concern they're pointing to. Justice Sotomayor, the fresh start that's given to debtors in Chapter 7 has a particular nature. The nature of the fresh start in Chapter 7 is that the debtor surrenders all of his or her assets and, in return, gets a discharge of all prepetition debt. It's never been the case that the Chapter 7 fresh start has encompassed an ability to retain property and also strip off liens on that property. If the debtor wanted- and this doesn't force the debtor to stay in a house that he or she can't afford. If the debtor wanted to, say, cure a default on his mortgage and keep the house, Chapter 13 is open to the debtor, which permits curing a default on a mortgage and maintaining payments during the course of the plan. Under Chapter 7, a debtor can, if the debtor is in the situation of these debtors and the debtor has been abandoned back to the debtor, if the debtor is current on its loans, can keep the house, pay its mortgage going forward, and be in the same situation that he was prior to bankruptcy. The one thing that Chapter 7 gives a debtor in that situation is that it discharges the debtor of any personal liability for the mortgage debt. So the lender cannot come after the debtor personally. If the debtor decides that the house is too expensive for him to stay in, he can stop paying the mortgage, and the only recourse that the lender then has is to foreclose. So there certainly is an ability for debtors to walk away from houses that they simply can't afford, and there is also an ability through Chapter 13 to cure existing defaults and reach an arrangement through which the debtor can keep the house. Scalia. Ms. Spinelli, I dissented in DUSNIP, and I continue to believe that dissent was correct. Why should I not limit DUSNIP to the facts that it involved, which is a partially underwater mortgage? Justice Scalia, I don't think that can be done coherently, given the reasoning of the Court in DUSNIP. What the Court held in DUSNIP is that Section 506B. Yes, I understand that, but I think the reasoning was wrong. And very often we adhere to a prior decision that the – on the facts of that case. And DUSNIP did say, you know, we're just limiting it to the facts of this case, and we're not saying what these terms mean elsewhere in the Bankruptcy Act. So let's take DUSNIP at its word and just limit it to what it involved, which was a partially underwater mortgage. Now, why shouldn't I do that? I don't believe that's logically possible, even if DUSNIP was wrongly decided, because DUSNIP interpreted a specific phrase in a specific place in the book. I understand that, but we often limit prior decisions to their facts and don't follow their logic. Yes, Justice Scalia. If we followed their logic, we would never be able to do what I'm suggesting. But we often say, yes, the logic would lead us here, but it was a terrible decision and we're not going to extend it any further. Why would that be a bad idea here? In this situation, we're talking about an interpretation of language in a specific place in a statute, and to do that would be to read the exact same language in the exact same place in the statute to mean different things. I'm just not getting through to you. I'm willing to do that. I'm willing to do that when the language was read incorrectly the first time. Okay. But as a practical matter, I'm talking as a practical matter. And stare decisis is a very practical doctrine. Why should, as a practical matter, should I adhere to an opinion that I think was wrong? Well, I do think Clark v. Martinez would apply in this situation and prevent a barrier to doing that, but in addition to that. What is the case that you just cited? I apologize, Justice Ginsburg. That's one of the cases in which the Court has said that the same language in the same place in the same statute cannot mean different things in different factual circumstances. There's a dissenting opinion in a different area of the law on taxpayers standing under the Establishment Clause, a brilliant dissenting opinion that you might want to rely on in this context. I've never been able to figure out the answer to the question he raises, which is I take a dissenting opinion in one case, and then when do I say, okay, forget it? And the answer is sort of personal in a way. How strongly do you feel, given the need of the law, to advise lawyers, advise judges, advise Congress and others, if we all keep dissenting all the time, it will be chaos? If we never change, you can't stick to a principle. Have you found any way of drawing that line? I don't think there is a way. I think there is, Justice Breyer and Justice Scalia, which is that this Court has very rarely taken the step of overruling a statutory interpretation decision, certainly never in the kind of. I'm not talking about overruling. We're saying Doosnip subsists as far as partially underwater mortgages are concerned. The issue before us is whether we should extend it to totally underwater. Now, what I thought you were going to tell me – you know, I feel strongly that Doosnip was wrong, but I'm not going to upset expectations. I mean, if banks have been, you know, lending money for second mortgages on the assumption that they would not be stripped, I mean, that's what I thought you were going to tell me. You know, many expectations that have been rested upon this – this misbegotten opinion of Doosnip. It's certainly been the case that since Doosnip was decided until this decision by the Eleventh Circuit in 2012, it was – it was well established that Doosnip applied equally to completely underwater mortgages. And are you saying, then, that there has been substantial reliance on the Doosnip interpretation that you're supporting here by banks that have given second mortgages all over the country, the huge reliance that would be upset? I have been reliant. I thought that that's what you're going to say to Justice Scalia. I don't – I don't hear that being argued. I believe that there has been reliance. I actually don't think that's the most compelling argument as to why the Court shouldn't depart from Doosnip. The language in Doosnip simply can't be read to distinguish between completely  Kagan. Well, but if we could go back, I mean, I kind of agree with you that it's not a very compelling argument, this reliance argument, because I find myself in the same position as Justice Scalia. I read the two Doosnip opinions, and it seems to me that Justice Scalia clearly has the better of the argument. And then the question is, what are we doing? What do we do about that, and where do we go from there? And it does strike me that if – you know, these are the most sophisticated parties that can possibly be imagined, Bank of America and other banks, and it seems to me that they would be making essentially a bet on – and they would, you know, think about all the things – what is the probability that Doosnip will be extended to completely underwater mortgages? And presumably, they discounted all their various calculations in order to take into account the probability that another court would say, you know, Doosnip is not very persuasive, and we're just not willing to extend it any further. And I think that's probably what Bank of America and other banks did, is they said, you know, we think there's X percent chance that Doosnip will be extended and Y percent chance that it won't, and they made their cost and pricing calculations based on that calculation. So if that's the case, why should we worry about reliance? Justice Kagan, I do believe that banks have relied on the Doosnip decision as to whether they specifically made calculations about when it would apply, whether it would apply, whether it would apply, whether it would apply, whether it would apply.  And I would like to go back to the premise of your question, which is that this would be extending Doosnip. It wouldn't be extending Doosnip. It would simply be applying Doosnip to a set of facts in which the interpretation the Court gave in Doosnip is equally applicable. Ginsburg. Even though Doosnip itself said, no, we're deciding this case only and not any other. I think in your brief, you did make the point that Doosnip is now how many years old? It's almost 25 years old, Justice Ginsburg. And Congress could have changed it if it didn't like it, and Congress has amended the code. That's correct. I mean, Congress has amended the code substantially, both in 1994 and in 2005. In 1994, Congress overruled or modified a couple of these courts' bankruptcy decisions. It overruled Rake v. Wade. It modified the statute in response to this Court's decision in Nobleman. Well, that proves at most that Congress, like Doosnip, has applied to partially underwater mortgages. Isn't that right? I mean, that's all it proves. They let it stand. They did not overrule Doosnip as far as partially underwater mortgages. It doesn't say anything about how they feel about totally underwater mortgages. Justice Scalia, there is simply no distinction that can be drawn between partially and completely underwater liens in this situation. Doosnip held that a secured claim is a claim secured by a lien with recourse to the underlying collateral. That is equally applicable here. Likewise, I mean, the text of Section 506 certainly draws no such distinction. So it would be an odd thing to do to vindicate textualism to adopt the proposition that Respondents are advancing here. We all know how to hurt a fellow, don't we? I mean, I understand the notion and agree with it completely, that if you have a decision that's wrong, you don't extend it in any way. But there are factual distinctions, and there are factual distinctions. I mean, Doosnip may have been decided on a Tuesday. In this case, it could be decided on a Thursday. But you would not say, you know, we're not extending it, you know, we're simply not going to extend it to other cases. Exactly, Mr. Chief Justice. And in this particular instance, I assume the difference between underwater and totally – partially underwater and totally underwater is a completely – a completely fluid one in the sense that at the start of the bankruptcy – I didn't think about it. It was totally unintended. But the idea is that, you know, throughout a bankruptcy, you could have a mortgage that is a lien that's underwater, then totally underwater, then partially underwater. And the idea that you'd latch onto that as a distinction seems to me to be a difficult proposition. That's exactly right. I mean, the nonbankruptcy right of a lien holder is to retain its lien until payment in full or until foreclosure, which means that the lien holder is entitled to access any equity that may develop in the future due to appreciation of the property to secure its lien. Is this right? I want to be sure I understand. Under DUSNAP, for the last 25 years, lenders and others in the bankruptcy community have understood the way it works is the following. If you have a lien and the house is worth 500,000 and your lien is secured and it's worth a million, and they're in Chapter 7, you have a secured interest and are counted as a secured creditor only to 500,000. As to the remaining 500,000, you're counted as an unsecured creditor, but you keep the lien. Right. And therefore, if when they're out of bankruptcy some day or the house goes up or whatever it is, you still have your lien. Is that right? That's right.  I mean, I don't quite understand. Section 506 — I just want to be sure it was right, but if you'd like to explain it further, do. It is right, and I would if I might. Section 506a bifurcates undersecured claims into a secured portion and an unsecured portion, and that determines the distribution that a creditor can get from the estate. Now, I want to be clear that nothing in the way this Court reads 506d will affect that. That is going to be true no matter what. What Dusnip said is that Section 506d does not refer back to that bifurcation in 506a. Rather, it uses the word secured in the ordinary English and ordinary legal meaning of secured by a lien with recourse to the underlying collateral. And in that situation, given that reading, 506d only strips liens securing disallowed claims. If the claim is valid, then the creditor is entitled to the claim. That means that after bankruptcy is over and you're back out of Section 7, Chapter 7, the lien, unless it falls within one of the other two exceptions there, remains. Correct. And therefore, and that's the understanding. Okay. I understand. Thank you. Correct. When do trustees decide that they're not sure of the value of the home and that they're going to sell it to find out what it's worth? Typically, the value is not disputed. It's usually quite clear whether there is or is not non-exempt, non-encumbered value in a house. And the trustee will sell the house only if there is non-exempt, non-encumbered value. It's possible that in a situation in which it's not clear, the trustee might go ahead and sell the house and see how much is realized for it. Because that sale price would then, by definition, establish the amount of the secured claim. Typically in, you know, typically in no-asset cases like this, there's simply no issue and there's no question that the trustee is not going to be selling the house. Just getting back to the reliance point, or really from your argument, the non-reliance point, the — your brief talked about the millions of loans and so forth that have been made, but you seem to walk away from any reliance argument. Justice Kennedy, let me be clear. I'm really quite surprised at that. Let me be clear. I am not walking away from the argument that the banks have relied on DUSNIP. I think that's unquestionably true. Millions of loans have been made in reliance on DUSNIP's holding. Banks, when they make loans, price them and extend them based on an understanding of what their recovery is going to be given default. That is true. What I was responding to is the notion that banks may have relied on, you know, whether this Court would apply DUSNIP to completely underwater mortgages. I think that's a little bit less strong, although it's true that in the 25 years since DUSNIP, it's until this decision by the Eleventh Circuit, it's been well established that DUSNIP does apply to completely underwater liens. May I reserve the balance of my time? Roberts. You may. Thank you. Mr. Bevis. Mr. Chief Justice, and may it please the Court. A claim unsupported by any value is a completely unsecured claim under Section 506A. An unsecured claim cannot be an allowed secured claim, and it's associated lien is void under Section 506D. Claims with some value remain secured. Claims with no value don't. They'd be wiped out in foreclosure, and bankruptcy treats them no better than foreclosure would. But before I get to text or hold up value or DUSNIP, let me seize on the striking concession of my adversary. Justices Scalia and Kagan pressed my adversary, who conceded that she couldn't demonstrate reliance here. There were bankruptcy courts and district courts that foreshadowed the ruling below, and they've pointed to no evidence of reliance. There is — we challenged in our brief to show that in the Eleventh Circuit, lending markets are being affected. No evidence. There are eight circuits in which lien voiding is allowed in Chapter 13. No evidence. We should clear the table of a reliance argument that my adversary all but concedes. Breyer. How she didn't concede it, and it just seems, you know, it's not just homeowners — you can cure me of this misapprehension — but probably in the last 25 years or 30 years, there have been trillions of dollars that have been loaned to businesses. I mean, think of Lehman Brothers, and they go bankrupt. And suddenly at stake are hundreds of billions of dollars, and a person who's made a mortgage, at least a lawyer, would say, okay, you can lend the money if things go badly. We can keep the lien. We won't collect because he's bankrupt, but markets go up and down. Keep the secured interest. They might go back up. You might get it someday. Now, that's perfectly obvious advice, it seems to me, from what I know so far. So when you do that, the mortgage lender has to decide what the interest rate is, how lent terms are, and it's pretty hard to believe there isn't some effect on the brain of the person who's making the mortgage from the simple fact that he gets to keep that lien, it passes through bankruptcy, and eventually the market may go back up. In addition to Justice Kagan's answer, which is the banks are well advised and can forecast, they can read the text of the statute and do enough to express their reservations. Breyer. We've had 25 years or 30 years, 23 years to be exact. And the fact is that, sure, they go to their lawyer. They don't read the lawyers, and the lawyers would read and the lawyers would say. I direct the Court to the Levitin-Amicus brief. There are two empirical studies that found natural experiments. One of them involved differences in circuits before Nobleman in Chapter 13, lien voiding, which found a very slight effect, 0.12 to 0.18 percent, on first mortgages. The other, an empirical study by Philadelphia Federal Reserve economists, likewise found no substantial effect on markets, even when different circuits adopted different I think the decision in your favor wouldn't, in a sense, hurt borrowers, because the market for a second is going to dry up or become much more expensive. I'll read the briefs, and you can tell me about why that theory, economic theory, might be wrong, but it seems to me just common sense. Justice Kennedy, the Levitin-Amicus brief explains in greater detail, but there's a problem in the mortgage market, in that first mortgagees and debtors often want to work out mutually beneficial resolutions. As my adversary concedes, no negotiation goes on in bankruptcy. The second can prevent this from happening, and we cited multiple studies that show that the second lenders may wind up forcing homes into foreclosure. The other point that the Levitin brief makes is that this is primarily a problem of a housing bubble. This is a problem of very high loan-to-value piggyback second mortgages. They found no evidence of an effect on low loan-to-value home improvement, home equity lines of credit, of the sort that survive now that the regulatory compromise is in place. Kennedy, I would agree that their bargaining club might be too big in some instances, the bargaining club of the second. On the other hand, it does seem to me that there's room in close cases for a three-way compromise. I'm advised that that just doesn't happen in Chapter 7. I find that hard to believe, especially in major bankruptcies, not homeowner bankruptcies. Two responses, Justice Kennedy. The first part of your question was, well, what's the effect on mortgage lending? Even if there were an effect on second mortgage lending, one has to balance that against maximizing the value of first mortgages, which are purchase money mortgages which are helped by unclogging the housing market. The chief economist at Moody's Analytics said that resolving subordinate liens was the biggest obstacle to the housing recovery. Then your second question is, well, what about loan modifications and bargaining? My answer there is this Administration had a number of programs in place after the housing bubble. HAMP and HARP were these mortgage modification programs. The take-up rate on those was very disappointing, much lower than the Administration expected, because of the hold-up power. Breyer, why is this all about housing? Why isn't it about the — maybe there's — I'm expecting an answer. Why is it just about housing? Why isn't it about Lehman Brothers? Why isn't it about businesses? Why isn't it about commercial property? Because currently in Chapter 11, in cram-down reorganizations and the like, similar lien voiding already happens when there's no value to be — to secure it. That's statutorily? Right. Statutorily. Now, where in any statute, in 11 or 13, did Congress ever use the word voiding a lien as opposed to stripping down a lien? It doesn't use the phrase stripping down. It doesn't use the phrase void, Justice Sotomayor. And this is very important. The NACPA brief goes into this. There are references to retaining liens, to satisfying liens, to modifying liens. But as NACPA explains, those provisions all piggyback on 506, which values a claim, it goes over for adjudication in Chapter 11, the different classes of creditors, and then back to 506d, which is the provision that says that it voids liens. And NACPA's fear is that if this Court does not allow Section 506d to do what it's supposed to do, it could impair not only housing mortgage modifications, but business bankruptcies. But, no, I'm not — I just want to understand it. I'm a housing mall. I'm a mall. I'm Lehman Brothers. Yes. I go bankrupt. There are all kinds of liens all over the place. Doesn't the same law apply to them? Well, Section 1129 — It's the housing? Yes. It's a general question. There is. And if it's Lehman Brothers, if it's a Chapter 11 bankruptcy reorganization — No, no. But assume a big business in Chapter 7. Yes. Businesses under Chapter 7 do not receive a discharge. And so typically the business is filing under Chapter 11. If there is a liquidation, you are right, though, that the same logic could apply there. And whether it's a business bankruptcy or it's a mortgage or a home bankruptcy, there's still the need for the Bankruptcy Code's policies of finality and a fresh start. You know, I'm not familiar with a widespread practice of giving — taking a second mortgage on a business loan, unless it's your father-in-law. It's a very common practice for purchases of homes. I'm not aware that it's a common practice in businesses, getting second mortgages. It seems to me quite rare. But there are different tranches of debt sometimes, senior and junior debt obligations that would be analogous. But you're right. Numerically, this is going to be a huge issue in the housing market. Mr. Meebus, I'm really not a poor loser and, you know, I lost in Deusnip. But what I am concerned about is the — what should I say? The ridiculousness of saying if, under Deusnip — and you haven't asked us to overrule Deusnip. Under Deusnip, if there's $1 worth of value, okay, you don't lose your lien. But if there is zero value, $1 less, and it's stripped entirely, that seems to be a very strange, strange outcome. Why would any intelligence system want to produce an outcome like that? I'll talk about that doctrinally and then as a policy matter. Doctrinally, the Code has dozens of provisions that turn on a dollar difference in eligibility for Chapter 7 or presumptions of abuse and the like. Congress draws these lines. Section 1111B for business bankruptcies of organizations talks about inconsequential value. You keep your lien if it has some value. If it doesn't have some value. Scalia. You think this is a line that Congress drew, right? Congress drew it. Congress intentionally wanted Deusnip for partially underwater and really doesn't want Deusnip for totally underwater. Come on. I didn't say that, Your Honor. All right. I'd remind, Your Honor, of your opinion in Green v. Bach-Laundrie. If it's necessary to deviate from the text, which Deusnip admitted it was deviating from the text, pick the deviation that does the least violence to the text, that minimizes the amount of the deviation. We preserve a link, and Deusnip did not completely sever the link between 506a's requirement of value. It may take the least violence from the text, but it leaves, as Justice Scalia suggested, an absolutely draconian, arbitrary result. Okay. As a policy matter, Justice Scalia. And his opinion didn't say that you do that. No, Your Honor. I don't believe it's draconian. If a property is $1 above water, okay, it is preserved under this reading of Deusnip. But we've explained in our brief that foreclosures sell at deep discounts. There are high transaction costs. So a house might have to rise by half or more in value before there's any additional money on the table. So if anything, allowing preservation of a lien that has $1 nominal value is being somewhat overprotective, erring on the side of being generous and protective when there would be no money left in foreclosure. What it does is it clears out the liens that are nowhere close to having value in foreclosure. Roberts. Isn't the question complicated by the fact that whether it's $1 above or $1 below is a matter of a fairly subjective valuation by the court? On the contrary, Your Honor. Section 506A expressly provides for judicial valuation. Nobleman recognized it would be judicial valuation. The House reports recognized it would be judicial. Oh, no, I know. It's judicial valuation. But that's the problem. If you're cutting a fine line and saying it's up to the judge who can look ahead and say, well, this is going to happen in the bankruptcy and I'm worried about  $49,999 is not, but that is in control of the judge who's doing the valuation. Yes, but it's far more accurate than the realistic alternative of foreclosure. There are many more safeguards. One can the creditor can submit a proposed valuation. The creditor submits appraisals, expert testimony. There is a hearing. And that is far more protective than foreclosures, which have to be rushed sales, poor notice, poorly advertised, that require cash sales, that leave the creditor much less protection. The realistic alternative here is throwing the House into foreclosure and outside a bankruptcy, and then, in fact, the creditor winds up worse off. Not just the second, who has nothing to gain, nothing to lose, holds it up. The first mortgagee winds up losing value. If I might now take the Court back to the text of the statute. The text of the statute. Kagan, before you do, could I go back to something that the Chief asked about, Chief Justice asked about earlier, which is this question of whether a distinction between fully underwater and partially underwater is coherent at all. Here's what Doosnip said. Doosnip, on the one hand, said we're deciding this case and this case only. But it also said this. This is how it framed its holding. We hold that 506D does not allow Petitioner to strip down Respondent's lien because Respondent's lien excuse me, because Respondent's claim is secured by a lien and has been fully allowed pursuant to 502. So this claim, too, is secured by a lien and has been fully allowed pursuant to 502. It seems to come within this statement of the holding. And I guess the question is, you know, how is it that we can say that this is a sensical distinction at all, given that holding? Dreeben, Two ways. Let me focus on that sentence and then on things elsewhere in the opinion and then Nobleman. That sentence was careful, unusually careful, to phrase the holding in terms of the particular parties. That Respondent had value in the mortgage. That's why the Court said Respondent's claim, not claims in general. Then it used the verb strip down. That's bankruptcy jargon for a partially secured mortgage and reducing the amount, scaling down the indebtedness, the Court said two days ago. Kagan, I hear you, but it seems as though it's the second half of the sentence that is key here. Why are we doing this? Why are we holding this? Because the claim is secured by Alein and because the claim has been fully allowed. And both of those things also apply here. Respondent's claim also had some value that made it unquestionable that it was still secured. But I you're correct. I think, though, that the use of the verb strip down and the use of the Respondent particular limits that situation. It's very important, though, to go back three sentences before that to see what the Court hedged. The Court specifically reserved hypothetical applications, advanced at oral argument. Petitioner advanced two hypotheticals at oral argument. One of those was of the completely underwater junior mortgage. The Court said that those hypotheticals illustrate the difficulty of the broad creditors and government's rule, the same rule that Ms. Spinelli says that the Court embraced, the same rule she quoted during her argument as if it were the Court's holding about, well, it's, there's some collateral, therefore it's secured. The Court declined to rule on all possible fact situations in light of that hypothetical, and it said we therefore focus on the case before us and allow other facts to await their legal resolution. Alito, why haven't you argued that we should overrule DUSNIP? Is it because of reliance, because you think that there has been a great deal of reliance on DUSNIP as applied to a partially underwater mortgage but not reliance as applied to totally underwater? Your Honor, it's quite right that those are two different categories. It's not our burden to take on stare decisis because we win under DUSNIP. Either way, the Court can do what it wants, but we have not advocated it. We've been faithful to DUSNIP's holding and its reasoning, including the express limitations it put on its reasoning. Its reasoning was limited to a case with some value. But the law would be much more coherent if either DUSNIP applies to the totally underwater as well as partially underwater, or DUSNIP is overruled. I don't believe that's the case. In terms of while the Court could consider overruling DUSNIP, we haven't advocated for that because even our reading of the statute is still more faithful to the text than Petitioner. Sotomayor, I'm not sure how. I mean, you're giving the same, exactly the same phrase in the statute, two different meanings depending on whether one's underwater or not, completely or partially. Where do you find that distinction in 506? Okay. Section 506a defines what an allowed secured claim is. No, but that's the argument that Justice Scalia made that was rejected. You're giving the same phrase, two different meanings. How do you apply the meaning in DUSNIP to this case? On 506d, DUSNIP was interpreting a claim that was a hybrid. It had a secured claim component and an unsecured claim component. The secured claim component had some value. That value was sufficient under 506a that there was a partial secured claim. DUSNIP must be read in light of Nobleman a year later. Nobleman said there's a secured – it's a Chapter 13 case, but it interprets 506, which applies across the code. Nobleman said there's a secured claim component, there's an unsecured claim component. The petition – the creditors in Nobleman advanced the same argument, the same argument that my adversary advances, which is 506 is just about priority and distribution. It has nothing to do with lien voiding. DUSNIP resolved this issue. Every claim that is secured by a lien is secured. Sotomayor, but Nobleman was not about 506. It was about 1322. And 1322 talks about the bankruptcy court's power to modify the rights of any creditor, whether secured or unsecured. That's how it's been read by the courts. Yes, but 1322's operative phrase is modifying the rights of holders of secured claims. In order to be a holder of secured claim, one must have a secured claim. And so in Nobleman, this Court stressed Petitioners were correct in looking to Section 506a for a judicial valuation of the collateral to determine the status of the bank's secured claim, whether there was a secured claim or not. There was a secured claim component. And so the Court said the bank is still the holder of a secured claim because  So the issue in Nobleman, as in DUSNIP, was, okay, we have a secured claim component under Ron Peer. We have an unsecured claim component. Do we split the baby? Do we chop them in half? And Nobleman said no, in part because it's a difficult thing to change the amortization, the loan term, the payments, et cetera. There's some value here that supports this, so we're going to leave it as an indivisible whole. This Court could easily understand a loud secured claim in 506d if it wished to preserve DUSNIP's holding, just as a binary term. If there's some money there.  Breyer. If you can do that linguistically, I could see a difference. The part that I'm having a hard time with is if this further earlier case survives. Let's imagine a commercial loan. Can I put it in a commercial context, just the numbers? Mortgage, the lender lends $5 million, the senior lender, to a commercial building, which then goes into Chapter 7. The junior lender lends $2 million, so now he has $7 million. The property ends up being worth $1 million. So the senior lender under DUSNIP comes in and says, okay, I have a secured interest for $1 million, but I can keep the mortgage here for $4 million, you know, in case things change 10 years from now. Isn't that under DUSNIP? The senior guy can. It's partly. Well, in a corporate bankruptcy, this doesn't apply. Breyer. Okay. Then I'll say it's a very — I just want some numbers. The senior person says — put it on whatever you want. The senior person says, oh, I get to keep my $4 million mortgage, maybe things will change, you know, and eventually I may be able to collect some, right? That's DUSNIP. Except. Except what? The difficulty there — so you're saying that there's a completely different unsecured second mortgage that an individual can get? No, no. I haven't made my example yet. All right. I just want to know if I'm right so far. So there's one mortgage. It's $5 million. The property is worth $1. Right. And so what happens to Bank X is he gets maybe as a secured credit of $1 million if he wants, but if he doesn't want to collect it now, he doesn't have to. And he keeps $5 million. He keeps that mortgage going as long as he wants. Yes. Yes. Okay. So Junior comes in, and Junior says, hey, he got to keep $4 million just in case. I have my mortgage for two. Why can't I? Now, I can think of some words here that might say, well, there's the difference, is what you're pointing to. I just want to know, in terms of commercial practice or anything else, what's the answer to his point? He got to keep $4 million on the hope it will go up eventually. Why can't I keep my $2 million? My documents are just as good as his. My mortgage is just as good as his. I mean, why can't I? So there's a functional answer and a historical answer. I take your interest more in the functional answer, but I'll start there. There's a big difference between a single creditor, single debtor situation. In Deussenup, the debtor was just trying to stop a foreclosure so the debtor could get a better deal. Here we have a multi-creditor situation. The creditor is this junior creditor is seeking a better outcome than it would get in State law foreclosure. That better outcome comes in part from holdup or hostage value that can limit the ability of the senior lender and the property holder to negotiate a loan modification of work out that makes everybody better off, makes assets more freely transferable and improves the market. And that does come at the price of the junior lender, but that's what happens in Cramdown as well. In a Cramdown, junior interests are squeezed out so that the senior people can maximize the value of the assets and deal with them freely. Breyer. Why can't you say the same thing about the only one lender? He doesn't have to keep that four, you know. He could say, give me 30 cents extra, I'll foreclose today, and there you are, free, never having this hanging over your head, and I'll do it for an extra 30 cents, you find it. Now, that's called the same thing you said. It's called this, this, what did you call it, whatever it is. You see, people with mortgages can do that. Right. But there's not the same multi-creditor. No, there is one rather than two. And maybe two would be better than three, or three would be better than four. Since you're asking specifically in functional terms, and I'll get to the bankruptcy history later, there's a coordination problem when a coordination problem can be a game of chicken, each of them holding out for more money, and then two people can drive over a cliff in a game of chicken. Now, on to the bankruptcy history. Why is this relevant to the law? There's a steady trajectory in bankruptcy law of increasing lien voiding power. In 1934, Section 77B authorized lien voiding in business reorganizations. In 1938, the Chandler Act, Chapter 12, extended that to individual reorganizations. In 1952, the amendments broadened it. They rejected the absolute priority rule for individual debtors, so the debtor can hang on to the assets and the liens can still be voided. Then in 1978, the modern Code enacted Section 506, which applies across the Code, all Chapters 7, 11, 12, and 13. So this is part of an increasing recognition over time that it's necessary to solve these holdup problems. And the realistic alternative, my friend, Ms. Spinelli, in her reply brief says, well, if we hang on to this lien, 10 years from now, the first will keep getting paid down and then our second will come into the money. Well, that's not realistically what happens in these cases. In borderline cases, 105, 110 percent of loan-to-value, people stay in the houses. They keep paying. It's too much cost to pick up the kids and move to a different home. When you get to 130 percent of loan-to-value, the median home that's underwaters with a second that's underwater is 135 percent of loan-to-value. When you get to 150 percent of loan-to-value, at those ranges, lots of people are in default. They qualify for bankruptcy because they've lost a job or they're ill. They can't make the payments and pay into a black hole of negative equity. They walk away. The home is thrown into foreclosure anyway. And the senior creditor is worse off, and the junior doesn't care because the junior doesn't get anything either way. Kagan. Mr. Bibas, can I take you back to Justice Alito's question, which was about stare decisis and why you haven't argued it? Because I'll tell you that my sort of reaction to this case is that these distinctions that you're drawing between partially underwater and fully underwater are not terribly persuasive. But the only thing that may be less persuasive is Doosnip itself. And so the question to me is, or at least one question, is whether we should bite the bullet and overturn Doosnip. And maybe you're right that that's for us to decide, and that you – but if you do have something relevant to say about that matter, here's your chance to say it. I think it's worth – if the Court wishes to consider that, and again, that's not been the position we've advocated because we don't need it to win, it's worth starting with Justice Thomas's concurring opinion in 203 North LaSalle, which pointed out the massive confusion that's been sown in the courts trying to grapple with this ruling, which Judge Gorsuch's ruling in Woolsey that says that Doosnip has lost every away game it's played, that it doesn't fit with the other provisions of the Code, there's a lot of confusion there. It has almost uniform criticism in the scholarly commentary. My colleague can't point to reliance interest in the markets, and the empirical studies discussed in the Levitin brief suggest that there isn't substantial reliance on this, in part because you benefit some first mortgagees who manage to maximize their value by voiding some of these junior ones. And so the reliance interest that my friend has walked away from and the uniform criticism of Doosnip might interest this Court in considering revisiting it, but it's not necessary because Doosnip itself reserved the completely underwater hypothetical on the face of its opinion. It was exceptionally narrow and the lawyers could read and see that it declined to reach this issue. And I do think that it is very important to read Doosnip together with Nobleman, that Doosnip doesn't stand on its own, that Nobleman, it's true, it was under 1322b2, it was a Chapter 13 case, but it was fundamentally about interpreting 506a. Is it just a distribution provision, as my client argued? Sotomayor, No, what the Court said, I don't understand that argument, said there's a distinction between the two. Yes, you divide it up to secured and unsecured, but you treat it all the same. That's what it said. You treat it all the same. Exactly. You decline to cut it into pieces, and one of the reasons you decline to cut it into pieces is because the claim secured by Alleen encompasses both of those. So once the Court has the power, what it was saying under 1322 to modify that, then the Court could change both the secured or the whole lien, is what it was talking about. But the last part of that opinion pointed out that if you modify the unsecured portion, you have ripple effects upon the secured portion. You wind up changing things like the interest rate or the amortization or the fees, and so you might be viewed as sabotaging or undermining what deserves to remain a secured component. In this situation, there is no such problem. So all — it is worth noting, by the way, my friend also says, well, this lien, it can sit out there, maybe it retains value sometime in the future, isn't that enough value? And I think Justice Breyer was gesturing towards that. All eight circuits after Nobleman have understood that Nobleman drew a line between some value and no value. All eight circuits to confront lien voiding in Chapter 13 allow it because they recognize that the completely underwater junior qualifies as no value within the meaning of the code. Present economic value is what this Court's cases have consistently focused on. The value of the claim is equal to the value of the collateral, this Court has said. And that's the present value of the collateral. The statute uses the present tense in Section 506. Whether it is or is not, it's not about forecasting or speculating into the future. That would be unworkable. But judicial valuations are workable. The bankruptcy rules, Rule 3012 and 7001, provide for it, and there's abundant case law that shows it to be both workable and fairer to creditors than the alternative, which is a foreclosure. The judgment below should be affirmed. Roberts. Thank you, counsel. Ms. Spinelli, you have four minutes left. Thank you. Just a couple of points. Completely underwater liens are not valueless. Their value stems from the potential for appreciation in the collateral. Indeed, a lien that's completely underwater by a dollar might have more value than a lien that's supported by a dollar of equity, depending on the potential for appreciation. The value, if the houses were sold today, is simply irrelevant, because the situation only arises where the debtor is keeping the house. And one could have said in DUSNIP, look, the current value of the collateral is less than the amount of your loan. It's fair to give you the current value of the collateral. DUSNIP held to the contrary, and that's precisely the same here. There is no distinction that supports drawing a line at completely underwater liens, given that the secured creditor has the same non-bankruptcy right to have its lien stay with the collateral until foreclosure and payment in full, and to realize any appreciation in the value of that collateral. This doesn't give a junior lien holder a better deal than it would receive under state law. It gives it the same deal it would receive under state law. To respond to a point that I think Justice Sotomayor made, the fact that there are specific provisions in chapters 11 and 13 that do permit stripping down liens in certain circumstances supports the DUSNIP court's view of 506D. It certainly doesn't undermine it. 506D is not the provision that strips down liens in chapters 11 and 13. Rather, there are specific provisions which are in the addendum to our brief in section 1325 for chapter 13. And actually, this is not in the addendum 1129B for chapter 11. Those provisions would make no sense if 506D were itself a lien stripping provision. And just to take one example, if one looks at section 1325A5, which appears on page 6A of the blue brief, that sets out the terms under which a chapter 13 debtor can strip down liens. And it says that, with respect to each allowed secured claim provided for by the plan, the plan provides that the holder of such claim retain the lien securing such claim until the earlier of the payment of the underlying debt determined under non-bankruptcy law or discharge. Now, it would make no sense to permit the lender to keep its lien until payment of the full debt if the lien had already automatically been stripped down under 506D to the value of the collateral. And that's just one example. We discussed some others in our briefs, including section 722. And we also discuss in our briefs the textual indications in section 506 that support the Jusnip's court's holding. So, and those are all reasons why Jusnip was correctly decided in the first instance and shouldn't be overruled, but to respond to Justice Kagan's question, beyond that, the rule of law simply doesn't allow this court in the typical situation to overrule a statutory interpretation decision in a case like this, where Congress over the past 25 years has acquiesced in that decision. Thank you, counsel. Thank you. Case is submitted.